**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| **ELEVANCE HEALTH, INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 3:25-cv-740** |
| **MARIA GREGORY,** | |
| **Defendant.** | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION

319472715v3

# Table of Contents

Table of Authorities ........................................................................................................ ii

Introduction ...................................................................................................................... 1

Facts ................................................................................................................................. 2

    A. Gregory's Role as Regional Vice President at Elevance Health ...................................... 2

    B. The Stock Grant and the Non-Competition Provisions .................................................. 4

    C. Gregory Resigns and Immediately Breaches the Agreement By Working
       for Gravie in a Competitive Role .................................................................................... 6

    D. Gregory and Gravie Refused to Offer Any Assurance that Gregory Intends
       to Abide By Her Agreement .......................................................................................... 10

Argument ........................................................................................................................ 12

    I. Legal Standard ............................................................................................................ 12

    II. Elevance Health is Likely to Succeed on the Merits of Its Breach of
       Covenant Not to Compete Claim .............................................................................. 13

        A. The Agreement is a binding contract between Gregory and Elevance
           Health ...................................................................................................................... 14

        B. The Noncompetition Provision is reasonable and enforceable under
           Indiana law ............................................................................................................. 14

        C. Gregory breached the Agreement .......................................................................... 23

    III. Elevance Health Will be Irreprably Harmed if the Preliminary Injunction
       Is Not Granted .......................................................................................................... 23

        A. Breach of a non-compete agreement is prima facie evidence of
           irreparable harm under Indiana law ....................................................................... 24

        B. Damages resulting from Gregory's breach will be difficulty to
           quantify, meaning that Elevance Health has no adequate remedy at law ................. 26

    IV. An Injunction is in the Public's Interest and the Balance of Equities Tips
       in Elevance Health's Favor ....................................................................................... 28

    V. The Parties Waived The Bond Requirement Through the Agreement ........................... 29

Conclusion ...................................................................................................................... 29

## Table of Authorities

**Cases**                                                                    **Page(s)**

*AL-KO Axis, Inc. v. Revelino*,
    No. 3:13-CV-1002 JD, 2013 WL 12309288 (N.D. Ind. Oct. 25, 2013) ...........................16, 23

*Atl. Diving Supply, Inc. v. Moses*,
    2014 WL 3783343 (E.D. Va. July 31, 2014) ......................................................................15

*Austin Powder Co. v. Wallwork*,
    761 F. Supp. 612 (S.D. Ind. 1990) ("Indiana courts have held that two years is
    not an unreasonable length of time for a covenant not to compete.") .....................................17

*Biomet 3i, LLC v. Land*,
    No. 116CV00125TLSSLC, 2017 WL 1483461 (N.D. Ind. Jan. 10, 2017) ...........18, 19, 20, 21

*In re Cap. One 360 Sav. Acct. Int. Rate Litig.*,
    779 F. Supp. 3d 666 (E.D. Va. 2024) ...............................................................................15

*Cent. Indiana Podiatry, P.C. v. Krueger*,
    882 N.E.2d 723 (Ind. 2008) .......................................................................................17, 24

*Coates v. Heat Wagons, Inc.*,
    942 N.E.2d 905 (Ind. Ct. App. 2011)........................................................................18, 26, 27

*Collins v. McKinney*,
    871 N.E.2d 363 (Ind. Ct. App. 2007).....................................................................................13

*Cork Med., LLC v. Lukaszewski*,
    No. 1:15-CV-00765-DKL, 2015 WL 5227929 (S.D. Ind. Sept. 4, 2015) ........................20, 21

*Ervin Graves Strategy Grp., LLC v. Feikes*,
    No. 1:23-CV-1395, 2023 WL 11690929 (E.D. Va. Dec. 20, 2023) .......................................29

*Gleeson v. Preferred Sourcing, LLC*,
    883 N.E.2d 164 (Ind. Ct. App. 2008).....................................................................................26

*Globus Med., Inc. v. Jamison*,
    No. 2:22CV282, 2023 WL 5826908 (E.D. Va. Aug. 15, 2023) .............................................15

*Handsome Brook Farm, LLC v Humane Farm Animal Care, Inc.*,
    193 F.Supp.3d 556 (E.D. Va. 2016) ......................................................................................13

*Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*,
    64 N.E.3d 863 (Ind. Ct. App. 2016).......................................................................................24

*Harlan Laboratories, Inc. v. Campbell*,
    900 F.Supp.2d 99 (D. Mass. 2012) ........................................................................22

*Hooper v. Musolino*,
    364 S.E.2d 207 (Va. 1988)....................................................................................15

*JTH Tax, Inc. v. Aime*,
    No. 2:16CV279, 2016 WL 8674623 (E.D. Va. July 1, 2016) .................................29

*Kira (US) Inc. v. Samman*,
    No. 123CV919MSNWEF, 2023 WL 4687189 (E.D. Va. July 21, 2023) ...........24, 28, 29

*Kuntz v. EVI, LLC*,
    999 N.E.2d 425 (Ind. Ct. App. 2013)....................................................................24

*Levine v. Meador*,
    No. 120CV1073TSETCB, 2022 WL 18912678 (E.D. Va. Mar. 29, 2022)...........25

*MED-1 Sols., LLC v. Taylor*,
    247 N.E.3d 1269 (Ind. Ct. App. 2024).......................................................16, 22, 23

*In re Microsoft Corp. Antitrust Litig.*,
    333 F.3d 517 (4th Cir. 2003) ................................................................................13

*Norlund v. Faust*,
    675 N.E.2d 1142 (Ind. Ct. App. 1997)..............................................................17, 24

*Prod. Action Int'l, Inc. v. Mero*,
    277 F. Supp. 2d 919 (S.D. Ind. 2003) ...................................................................18

*Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*,
    442 F. App'x 776 (4th Cir. 2011) .........................................................................26

*Simpson Plastering, LLC v. Skanska/Trident*,
    No. CV 2:16-3439-RMG, 2017 WL 773550 (D.S.C. Feb. 27, 2017)....................25

*Standard Register Co. v. Cleaver*,
    30 F. Supp. 2d 1084 (N.D. Ind. 1998) ..................................................................17

*Titus v. Rheitone, Inc.*,
    758 N.E.2d 85 (Ind. Ct. App. 2001)......................................................................22

*Turnell v. CentiMark Corp.*,
    796 F.3d 656 (7th Cir. 2015) ................................................................................26

*Unger v. FFW Corp.*,
    771 N.E.2d 1240 (Ind. Ct. App. 2002)..................................................................16

iii

*University of Texas v. Camenisch*,
    451 U.S. 390 (1981)..................................................................................................13

*Variable Annuity Life Ins. Co. v. Coreth*,
    535 F. Supp. 3d 488 (E.D. Va. 2021) ..............................................................13, 26

*Vickery v. Ardagh Glass Inc.*,
    85 N.E.3d 852 (Ind. Ct. App. 2017)........................................................................24

*Vocelli, LLC v. JAF3, Inc.*,
    No. 1:23-CV-1284, 2023 WL 9105453 (E.D. Va. Dec. 20, 2023).........................29

*Zimmer US, Inc. v. Keefer*,
    No. 3:12-CV-395-JD-CAN, 2012 WL 5268550 (N.D. Ind. Oct. 23, 2012) ...............19, 20, 21

*Zimmer, Inc. v. Sharpe*,
    No. 3:09-CV-117 RM, 2009 WL 10690836 (N.D. Ind. Mar. 31, 2009) ...................18, 19, 26

## Other Authorities

Fed. R. Civ. P. 65 ..........................................................................................................1

Fed.R.Civ.P. 65(c) ......................................................................................................29

Plaintiff Elevance Health, Inc. ("Elevance Health"), by counsel, and pursuant to Fed. R. Civ. P. 65 and Local Rule 7, hereby files its Memorandum in Support of its Motion for a Temporary Restraining Order or, in the Alternative, a Preliminary Injunction. In support of its Motion, Elevance Health respectfully shows this Court the following:

## **INTRODUCTION**

This action seeks to enforce Elevance Health's rights under a March 2025 Restricted Stock Unit Award Agreement (the "Agreement"), in which Defendant Maria Gregory, a former senior underwriting executive, agreed not to compete with Elevance Health for a twelve-month period following the end of her employment.  In exchange for the Agreement, Gregory received stock units and other equity compensation. Four months later, in July 2025, Gregory resigned and immediately breached the Agreement by accepting a position as a senior underwriting executive at a direct competitor in the burgeoning and highly competitive field of level funded insurance.

Elevance Health now seeks to prohibit Gregory from directly competing with Elevance in violation of the Agreement and moves this Court for a Temporary Restraining Order ("TRO") or, in the alternative, for a preliminary injunction.  The non-competition provisions of the Agreement are reasonable and enforceable under Indiana law, which governs the parties' agreement and this dispute. As set forth below, preliminary injunctive relief is warranted because Elevance Health is likely to succeed on the merits, it faces imminent and irreparable harm absent injunctive relief which cannot be adequately compensated by money damages, and the balance of equities and public interest strongly favor the issuance of an injunction. Accordingly, Elevance Health respectfully requests that the Court grant a TRO or preliminary injunction to preserve the status quo and prevent further harm pending resolution of this dispute on the merits.

## FACTS

1. Elevance Health is in the business of offering health insurance plans and services, including medical, pharmaceutical, dental, behavioral health, long-term care, and disability plans. Elevance Health also serves as a third-party administrator for certain employers and administers a level-funded plan known as "Anthem Balanced Funding," which is a fast-growing and highly popular product of great strategic importance to Elevance Health. (Verified Amended Complaint, ECF No. 1 ("VAC"), ¶¶ 6, 9, 14-15.)[1]

**A. Gregory's Role as Regional Vice President at Elevance Health.**

2. Elevance Health employed Gregory from July 2007 until her resignation, which was effective on or about July 23, 2025. (*Id.* ¶ 7.)

3. At the time of her resignation, Gregory held the position of Regional Vice President II, Underwriting, where she oversaw 80 employees, covering fourteen states and multiple product portfolios. (*Id.* ¶ 8.)

4. By July 2025, Gregory earned a base annualized salary of $238,840.73. (*Id.* ¶ 10.) Gregory also received substantial equity compensation. Between March 2012 and March 2025, Elevance Health granted Gregory 1,022 shares of exercisable stock options through ten separate equity grants. During that same period, Elevance Health separately granted Gregory 927 shares of restricted stock through twenty-four grants. (*Id.*)

5. Gregory was an executive within Elevance Health's "Underwriting Center of Excellence," where she was responsible for all underwriting for small (50 or fewer employees) and "key" accounts (51-99 employees) focusing on Anthem Balance Funding and Multiple

---

[1] A more fulsome factual recitation appears in the Verified Complaint. In the interests of page limitations, Elevance Health briefly repeats the most salient facts here.

2

Employer Welfare Arrangements ("MEWAs") in the "Anthem 14" states, which covered California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. (*Id.* ¶ 9.)

6.      Gregory's role in underwriting for small and key accounts provided her with a vast knowledge of these markets and put her at the center of Elevance Health's strategic push into level-funded health plans, which is a burgeoning field in the insurance industry. (*Id.* ¶ 12.)

7.      Level-funded health plans are hybrids of fully insured and self-funded models, designed specifically for small- to mid-sized businesses (i.e., small and key accounts). Employers pay a fixed monthly rate to cover projected annual claims, administrative services, and stop-loss insurance. If claims are lower than anticipated, employers receive a credit for the surplus. Conversely, if claims exceed expectations, stop-loss coverage protects against excessive costs. These plans are attractive to many small and mid-size employers due to predictable monthly costs, protection from unexpectedly high claims, and the potential for cost recovery when claims are lower than expected. (*Id.* ¶ 13.)

8.      Because of its increasing popularity with employers, the market for level funded health plans is highly competitive and many insurance companies have entered the market in recent years, including Gravie. (*Id.* ¶ 14.)

9.      In recent years, Elevance Health's Anthem Balanced Funding plan has experienced substantial year over year growth, and the continuation of this growth is a core component of Elevance Health's strategic plan for the future of its business. (*Id.* ¶ 15.)

10.     Gregory directly oversaw the head of the underwriting team for Elevance Health's Anthem Balanced Funding plans across all the "Anthem 14" states. Because of her senior position and oversight of the Anthem Balanced Funding plan, Gregory had extensive access to Elevance

3

Health's entire underwriting process, including confidential pricing formulas, bidding and renewal strategies, business intelligence, and other trade secrets which are crucial to Elevance Health's competitive advantage in the level funded insurance market and which would be of great economic value if known to a competitor. (*Id.* ¶ 16.)

**B. The Stock Grant and the Non-Competition Provisions.**

11.    In addition to her base salary, Elevance Health regularly awarded Gregory with additional equity compensation in the form of stock options and restricted stock units. In each award agreement, Elevance Health conditioned its payment of equity compensation upon Gregory's agreement to abide by certain restrictive covenants that protected Elevance Health from unfair competition.  (*Id.* ¶ 17.)

12.    Most recently, on March 14, 2025, Elevance Health awarded Gregory restricted stock units, performance stock units, and stock options (collectively, the "Stock Grant"), which were conditioned upon Gregory's acceptance of the Agreement, a copy of which is attached to the VAC as Exhibit A. (*Id.* ¶ 17.)

13.    The Agreement was provided as part of Elevance Health's 2017 Health Incentive Compensation Plan, June 2022 Restatement (the "Plan"), and the Agreement incorporated the Plan by reference in full. (*See* VAC, Ex. A, § 14.) A copy of the Plan is attached to the VAC as Exhibit B. (*Id.* ¶ 18.)

14.    The Plan and the Agreement are governed under Indiana law.

15.    In exchange for Gregory's acceptance of the Stock Grant, she agreed to certain reasonably defined restrictions on unfair competition, which are set forth in Section 7(b) of the Agreement, titled "*Non-Competition.*" In relevant part, Gregory agreed that for a period of twelve months after the cessation of her employment with Elevance Health (the "Restricted Period"), she

would not: (1) obtain a "Competitive Position" in the "Restricted Territory" for a "Competitor" or

(2) perform a "Restricted Activity" in the "Restricted Territory" for a "Competitor," as those terms

are defined. (*Id.* ¶ 20, Ex. A, § 7(b).)

16.     "Competitive Position" means the following:

> any employment or performance of services with a Competitor (A) the same as or
> similar to the services that Participant performed for the Company in the last
> twenty-four (24) months of Participant's employment with Company (the "Look
> Back Period"), or (B) in the performance of which Participant will likely use any
> Confidential Information of the Company.

(*Id.* ¶ 21, Ex. A, § 7(b)(i).)

17.     "Restricted Activity" means "any activity for which [Gregory] had responsibility

for the Company," or about which Gregory had Elevance Health's confidential information within

the "Look Back Period" (i.e., the 24-month period prior to the cessation of her employment). (*Id.*

¶ 22, Ex. A, §§ 7(b)(i), (iii)).

18.     "Restricted Territory" is defined in the Agreement to mean:

> any geographic area in which the Company does business and which [Gregory]
> provided services in, had responsibility for, had a material presence or influence
> in, or had access to Confidential Information about, such business, within the
> Look Back Period.

(*Id.* ¶ 23, Ex. A, § 7(b)(ii).)

19.     Here, Gregory's "Restricted Territory" was the fourteen states for which she had

responsibility, including California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine,

Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. (*Id.* ¶ 24.)

20.     "Competitor" is defined in the Agreement to mean:

> means any entity or individual (other than the Company) engaged in any one or
> more of the following: management of network-based managed care plans and
> programs; administration of managed care services; provision of health insurance,
> long-term care insurance, dental, life, or disability insurance; administration of
> flexible spending accounts, COBRA continuation coverage, coordination of
> benefits, or subrogation services; or the provision, delivery, or administration of

> health benefit plans or health care services such as pharmacy benefits management (including Specialty pharmacy), value-based care delivery, behavioral health, palliative care, care for chronic and complex conditions, digital healthcare platforms, medical benefits management solutions, or health care research (including health economics and outcomes); or any other aspects of the business or products or services offered by the Company, as to which Participant had responsibilities or received Confidential Information about, during the Look Back Period.

(*Id.* ¶ 25, Ex. A, § 7(b)(iv).)

21.     Gregory agreed that the restrictions in § 7(b) are reasonable and necessary to protect Elevance Health's legitimate business interests. These legitimate business interests include Elevance Health's interest in protecting its good will, and the unfair competition that would result from the use of its confidential information and trade secrets to which Gregory had expansive access in her high-ranking position. (*Id.* ¶ 26.)

22.     On March 14, 2025, Gregory accepted her Stock Grant—thereby also accepting the Agreement and the terms and conditions set forth therein—via an electronic signature. (*Id.* ¶ 28.)

### C. Gregory Resigns and Immediately Breaches the Agreement By Working for Gravie in a Competitive Role.

23.     A mere four months later, Gregory resigned effective July 23, 2025, and began employment with Gravie, a Minnesota-based company that offers a variety of products and services in the health insurance industry that compete directly with Elevance Health. Upon information and belief, Gravie primarily serves small and midsize employers, which is the same demographic of client overseen by Gregory during her employment with Elevance Health. (*Id.* ¶ 29.)

24.     Gravie's "flagship" product is its "Comfort" level-funded health benefit plan, which competes directly with Elevance Health's Anthem Balanced Funding plan, targeting the same demographic of customer in many of the same geographic areas. (*Id.* ¶ 30.)

25.    Moreover, Gravie's Comfort plan is partnered with Cigna and Aetna, which allows Gravie to provide their customers with access to Cigna and Aetna's network of healthcare providers. Cigna and Aetna are also competitors of Elevance Health. (*Id.* ¶ 31.)

26.    According to Gravie, Gregory's new role of Senior Vice President, Underwriting is involved *only* in level-funded health benefit solutions. (*Id.* ¶ 32.)

27.    Gregory works in Chesterfield County, Virginia. (*Id.* ¶ 33.)

28.    Gregory's employment with Gravie is both (i) a Competitive Position within the Restricted Territory; and (ii) a Restrictive Activity within the Restricted Territory for a Competitor, and thus constitutes a material breach of § 7(b) of the Agreement. (*Id.* ¶ 34.)

29.    By serving as Senior Vice President, Underwriting for Gravie, working directly on Gravie's level-funded insurance product where she is overseeing underwriting operations, Gregory is engaging in a Restricted Activity because she is engaging in the same activities for which she "had responsibility for [Elevance Health]" and "about which [she] had Confidential Information within the Look Back Period." (*Id.* ¶ 37, Ex. A, § 7(b)(iii).)

30.    Gregory's position at Gravie is also a "Competitive Position" that violates Section 7(b)(i) of the Agreement for two independent reasons. (*Id.* ¶¶ 34-36; *see also* Ex. A, § 7(b)(i).)

31.    First, Gregory's work for Gravie is a "Competitive Position" because she performs the "same or similar services" for a "Competitor" as those she performed for Elevance Health in the last 24 months prior to her resignation. (*Id.*)

32.    Second, Gregory's work for Gravie is also a "Competitive Position" because she is likely to use Elevance Health's Confidential Information. (*Id.*)

33.    Furthermore, Gregory is performing the Restricted Activity and/or holds the Competitive Position within the Restricted Territory. (*Id.* ¶ 38.)

34.    Gravie and its subsidiaries are licensed in, and offer Gravie's "Comfort" product in some or all of the 14 states that Gregory oversaw during her last 24 months of employment at Elevance Health. (*Id.* ¶ 39.)

35.    Indeed, Gravie's website lists all of the state licenses it holds licenses to sell products. *See* https://www.gravie.com/compliance/gravie-licensing/. (*Id.* ¶ 40.)

36.    Gravie is a "Competitor," as defined by the Agreement because it sells products that compete directly with Elevance Health. For example, and without limitation, Gravie provides, delivers, and administers level-funded plans (the Gravie "Comfort" plans) that are directly competitive with Elevance Health's "Anthem Balanced Funding" plans. (*Id.* ¶ 41, Ex. A, § 7(b)(iv).)

37.    Gravie competes with Elevance Health in other ways, however. (*Id.* ¶ 42.)

38.    Gravie is a "Competitor" because it "administ[ers] managed care services" through its service as a third-party administrator.  Through its third-party administrator services, Gravie partners with Cigna and Aetna Signature Administrators to provide employers access to an extensive network of providers, while managing claims and benefits in-house. (*Id.* ¶ 43, Ex. A, § 7(b)(iv).)

39.    Elevance Health also offers third-party administrator services through its "Anthem Balanced Funding" plan. (*Id.* ¶¶ 1, 44.)

40.    Gravie is a "Competitor" because it "provid[es] health insurance plans." (*Id.*, ¶ 45, Ex. A, § 7(b)(iv).)

41.    Gravie markets itself as a health insurance marketplace that individually tailors health insurance plans to customers. (*Id.* ¶ 46.)

42.     Through its health insurance marketplace, Gravie sells a broad spectrum of health insurance plans offered by various insurers, including plans that compete with Elevance Health that are offered by Aetna, Cigna, Kaiser Permanente, Oscar, Sentara, and United, among others. (*Id.* ¶ 47.)

43.     Elevance Health provides a variety of health insurance plans to the market, including to small- and mid-sized businesses. (*Id.* ¶ 48.)

44.     Gravie is also a "Competitor" because it provides, delivers, and administers health benefits plans. (*Id.* ¶ 49, Ex. A, § 7(b)(iv).)

45.     Gravie is also a "Competitor" because it provides the same "products or services" offered by Elevance Health as those for which Gregory "had responsibilities or received Confidential Information" during the final 24 months of her employment at Elevance Health. (*See id.* ¶¶ 29-50.) In the final 24 months of her employment, Gregory had underwriting responsibilities for Elevance Health's level-funded "Anthem Balanced Funding" plans and obtained Confidential Information with respect to the operation thereof, including underwriting Elevance Health's confidential pricing data, and pricing strategies (for new customers, and for product renewals). (*See id.* ¶¶ 7-16; 29-50.)

46.     Elevance Health disclosed its Confidential Information to Gregory, including its strategy for allocating costs across the five different subcomponents of its Anthem Balanced Funding plans, including the costs of its administrative services, stop loss coverage (individual and aggregate), claim fund, and terminal liability coverage.  (*See id.* ¶¶ 7-16.)

47.     Elevance Health disclosed its Confidential Information to Gregory, including its marketing strategies for Anthem Balanced Funding plans, which included offering new customers

a "guaranteed surplus" and other financial incentives that allowed it to remain competitive in the level funded insurance market.  (*Id.*)

### D. Gregory and Gravie Refused to Offer Any Assurance that Gregory Intends to Abide By Her Agreement.

48.     Upon learning of Gregory's new employer, Elevance Health wrote to Gregory and Gravie on July 24, 2025, reminding Gregory of her obligations under the Agreement and informing Gravie that Gregory was subject to restrictive covenants. (*Id.* ¶ 53.)

49.     In response to Elevance Health's letter, which included a copy of the Agreement, Gravie dismissed Elevance Health's concerns and erroneously declared that the non-compete was unenforceable, *inter alia.* Immediately after dismissing Elevance Health's concerns, however, Gravie stated that it had "expressly instructed Gregory to uphold all obligations to any former employer, including Elevance Health" and invited Elevance Health to discuss the matter further. (*Id.* ¶ 54.)

50.     Gravie's invitation was disingenuous. (*Id.* ¶ 55.)

51.     Elevance Health spent the next two weeks attempting to contact Gravie's counsel to discuss the matter further but was ignored. Elevance Health wrote to Gravie again on August 18, 2025, seeking additional information about Gregory's role. (*Id.* ¶ 56.)

52.     Gravie responded on August 22, 2025, and assured Elevance Health that Gregory would abide by any "*enforceable* restrictive covenants" – a statement which offered no consolation considering Gravie's prior (erroneous) contention that the Agreement's non-competition provisions are unenforceable. Moreover, Gravie confirmed that Gregory's position of Senior Vice President, Underwriting, is "involved only in level-funded health benefit solutions," a product space that Gregory directly oversaw while employed by Elevance Health, as noted above. (*Id.* ¶ 57.)

319472715v3

53.     After her resignation, Elevance Health discovered a document Gregory created on July 1, 2025, which further establishes that her employment with Gravie is in breach of the Agreement.  (*Id.* ¶ 58.)

54.     As she was considering a job offer from Gravie, Gregory used her Elevance Health computer to create a document titled "Elevance Health vs. Gravie," which she sent to her personal email address on the same date of July 1, 2025 (the "Elevance Health vs. Gravie Document"). (*Id.* ¶ 59.)

55.     In the Elevance Health vs. Gravie Document, Gregory made the following admissions regarding Gravie and Elevance Health, including that both offered competing level funded products, had overlapping geographic areas of operation, and that Gregory's work in underwriting (current and future) overlapped as well. Gregory noted the following:

   a.  Gregory noted her current job title as Elevance Health's "RVP II Underwriting" and compared it to her upcoming job as "Senior Vice President, Underwriting" at Gravie.

   b.  Gregory acknowledged the overlap in geographic areas in which Elevance Health and Gravie do business. In relevant part, Gregory wrote: "ELV/Anthem . . . operates in 14 states." By contrast, she observed that, "Gravie . . . operates in all 50 states."

   c.  Gregory also acknowledged the overlap in "product offerings" between Elevance Health and Gravie by listing the insurance products offered by each, including that both offered "Level-Funded" products—which Gregory highlighted in yellow.

   d.  Finally, Gregory used her access to Elevance Health's proprietary systems to generate a report of insurance quotes where Gravie was listed as a carrier. Under that report, Gregory noted that the "Small Group and KEY (51-99 size groups)" are the market segments that Gravie and Elevance Health "would have in common." *Id.* Small and Key groups were also the market segments over which Gregory had responsibility during her employment at Elevance Health.

(*Id.* ¶ 60.)

11

56.     As discussed above, Gregory is in breach of § 7(b) of the Agreement by performing activities that are the same as or substantially similar to, and competitive with, the services she provided to Elevance Health immediately prior to her resignation. (*Id.* ¶ 61.)

57.     As a result of Gregory's conduct, Elevance Health is suffering and shall continue to suffer significant irreparable harm. (*Id.* ¶ 62.)

58.     Absent injunctive relief, Elevance Health will suffer further irreparable harm based on Gregory's activities, as described above. (*Id.* ¶ 63.)

59.     Gregory possesses the confidential pricing strategies of Elevance Health that was for new customers and renewals, as well as cost discounts, guaranteed surpluses, and other its marketing strategies that Elevance Health offered for its Anthem Balanced Funding plans during her final two years of employment with Elevance Health. In her new role at Gravie, Gregory will likely use the foregoing information to compete with Elevance Health in untold ways that will cause immediate and irreparable harm through its loss of its goodwill in the market place and potential relationships, much of which will be performed out of the public eye and may never be revealed to Elevance Health. Moreover, it is likely to be difficult or impossible to calculate the damages arising from Gregory's conduct, which will likely cause a permanent loss of customers, leaving Elevance Health without an adequate remedy at law.

60.     Gregory was served with the Complaint and Summons on September 17, 2025. (ECF No. 6.)

## **ARGUMENT**

### I.    **Legal Standard.**

The purpose of a temporary restraining order is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render

a meaningful judgment on the merits."[2]  The "'status quo' for purposes of classifying the nature of an injunction is the 'last uncontested status between the parties which preceded the controversy.'"[3] The last uncontested status between Elevance Health and Gregory is before Gregory began her competing position with Gravie.  Accordingly, Elevance Health seeks a TRO and/or preliminary injunction to preserve the status quo pending the Court's resolution of Elevance Health's breach of contract claim against Gregory resulting from her willful, intentional, and ongoing refusal to honor the non-competition provisions of the Agreement, and Gravie's willful nonchalance to the same.

A party seeking a TRO must show the same four factors necessary for issuance of a preliminary injunction, namely "[1] that it is likely to succeed on the merits, [2] that it is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in its favor, and [4] that an injunction is in the public interest."[4]  Each of those elements is easily satisfied here.  Elevance Health's requested relief should be granted.

## II.    Elevance Health Is Likely to Succeed on the Merits of Its Breach of Covenant Not to Compete Claim.

Preliminary injunctive relief is appropriate because Elevance Health is likely to succeed on the merits of its claim for breach of the covenant not to compete.  Under Indiana law, a breach of contract requires the plaintiff to prove: "(1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Collins v.*

---

[2] *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  *See also University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.").

[3] *Handsome Brook Farm, LLC v Humane Farm Animal Care, Inc*., 193 F.Supp.3d 556, 566 (E.D. Va. 2016) (quoting *Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 378 (4th Cir. 2012)).

[4] *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021).

*McKinney,* 871 N.E.2d 363, 370 (Ind. Ct. App. 2007).

Here, the Agreement imposes reasonable restrictions on Gregory that protects the legitimate interests of Elevance Health against unfair competition. Gregory has breached her obligations by directly competing with Elevance Health as a senior underwriting executive and level-funded health plan market in the Restricted Territory, resulting in irreparable harm to Elevance Health.

### A.  The Agreement is a binding contract between Gregory and Elevance Health.

The Agreement is a binding, legally enforceable contract.  Elevance Health offered the Stock Grants and the Agreement to Gregory on or about March 3, 2025. Gregory accepted the Stock Grants and the Agreement on March 14, 2025.

Both Elevance Health and Gregory executed the Agreement "intending to be legally bound." (VAC, Ex. A, at 2.)  The Agreement and the restrictive covenants contained therein were supported by consideration in the form of shares of restricted stock. (*Id.*, § 7.) Moreover, acceptance of the Agreement was not a condition of employment but was made voluntarily by Gregory. (*Id.*, at 2) ("The Company and Participant expressly agree and acknowledge that Participant's entry into this Agreement is not a condition of Participant's employment with the Company[.]"). Gregory knowingly chose to accept the terms of the Agreement and was handsomely compensated in return.

### B.  The Noncompetition Provision is Reasonable and Enforceable Under Indiana Law.

Under Indiana law, which governs the Agreement, the non-compete provisions are reasonable and enforceable because they protect a legitimate business interest and are narrowly tailored as to time, activity, and geographic area.

### i.    Indiana law governs the Agreement.

This Court should look to Virginia law (the forum state) to determine which law applies.[5] "Virginia law looks favorably upon choice of law clauses in a contract" and "courts considering contract-related claims will give a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances." *In re Cap. One 360 Sav. Acct. Int. Rate Litig.*, 779 F. Supp. 3d 666, 705 (E.D. Va. 2024). Virginia courts will honor choice of law provisions if the selected "state is reasonably related to the purpose of the agreement." *Hooper v. Musolino,* 364 S.E.2d 207, 211 (Va. 1988).

Here, the parties agreed that Indiana law would govern the Agreement. Gregory worked for Elevance Health, an Indiana corporation with its principal place of business in Indiana. Indeed, "[t]he Plan and All Award Agreements and other agreements hereunder shall be construed with and governed by the laws of the state of Indiana, without giving effect to the choice of law principles thereof[.]" (VAC, Ex. B, § 20.11.) The Stock Grant and the Agreement incorporate the Plan. (*Id.*, Ex. A, at 1.) Thus, the state of Indiana is "reasonably related to the purpose of the agreement. " *See, e.g., Atl. Diving Supply, Inc. v. Moses*, 2014 WL 3783343, at *6 (E.D. Va. July 31, 2014) (granting temporary restraining order to enforce restrictive covenant agreement and applying Virginia choice-of-law rules to select Fourth Circuit procedural law and Delaware substantive law, in accordance with parties' choice of law clause, where plaintiff was incorporated in Delaware).

ii.    **The non-competition provision is reasonable and enforceable.**

---

[5] "Federal courts exercising diversity jurisdiction apply the substantive law of the forum state, and federal procedural law." *Globus Med., Inc. v. Jamison*, No. 2:22CV282, 2023 WL 5826908, at *10 (E.D. Va. Aug. 15, 2023), *report and recommendation adopted,* No. 2:22-CV-282, 2023 WL 5608398 (E.D. Va. Aug. 30, 2023).

The non-competition provision is valid and enforceable under well-settled law in Indiana. Non-competes are enforceable under Indiana law provided they are reasonable. *MED-1 Sols., LLC v. Taylor*, 247 N.E.3d 1269, 1279 (Ind. Ct. App. 2024). To establish reasonableness, the employer must show that "it has a legitimate interest to be protected by the agreement" and that the agreement is "reasonable in scope as to the time, activity, and geographic area restricted." *Id.*

          a.   <u>The non-competition provision protects a legitimate business interest.</u>

The non-competition provision protects a legitimate business interest because, in her senior status as Regional Vice President of Underwriting, Gregory had extensive access to Elevance Health's confidential information, including confidential pricing formulas, bidding and renewal strategies, business intelligence, and other trade secrets which are crucial to Health's competitive advantage in the level funded insurance market – the precise market in which Gregory now works for Gravie – and which would be of great economic value if known to a competitor.

"To show a legitimate protectible interest, 'an employer must show some reason why it would be unfair to allow the employee to compete with the former employer.'" *Unger v. FFW Corp.*, 771 N.E.2d 1240, 1244 (Ind. Ct. App. 2002). "As an incident to its business, an employer is entitled to contract to protect the good will of the business." *Id*. "Goodwill includes secret or confidential information[.]" *Id.*; *see also AL-KO Axis, Inc. v. Revelino,* No. 3:13-CV-1002 JD, 2013 WL 12309288, at *7 (N.D. Ind. Oct. 25, 2013) (finding trade secrets and confidential information are substantial protectible interests).

Here, Elevance Health has a legitimate protectible interest in the confidential information provided to Gregory. Gregory managed the Underwriting Center of Excellence, Gregory was responsible for all underwriting for small (50 or fewer employees) and key accounts (51-99 employees) in the "Anthem 14" states, which covered California, Colorado, Connecticut, Georgia,

Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. Ms. Gregory's senior role in underwriting for small and key accounts provided her with vast knowledge of these markets, Elevance's methods of operation relative to how it underwrites those accounts, and put her at the center of Elevance Health's strategic push into the highly competitive and growing level-funded health plans space. Gregory was uniquely positioned to obtain Elevance Health's confidential business and pricing strategies for the "Anthem 14" states, which she has now taken to Gravie, and where she works only in its level-funded plan space in many of the same states.

        b.   The non-competition provision is reasonable in duration.

Under Indiana law, courts have consistently enforced restrictions far longer than the 12-month restriction in the Agreement. *Austin Powder Co. v. Wallwork*, 761 F. Supp. 612, 617 (S.D. Ind. 1990) ("Indiana courts have held that two years is not an unreasonable length of time for a covenant not to compete."); *Norlund v. Faust*, 675 N.E.2d 1142, 1155 (Ind. Ct. App. 1997) (finding a two year non-compete restriction to be reasonable); *see also Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1098 (N.D. Ind. 1998) (finding that a two-year restriction was reasonable). Thus, Gregory cannot legitimately contest the reasonableness of the 12-month restriction here where longer restrictions would still be enforceable under Indiana law.

        c.   The non-competition provision is reasonable in geographic scope.

The non-competition provision is reasonable because it applies to a geographic area that is no broader than the territory for which Gregory had responsibility during her employment as an underwriting executive at Elevance Health.

"Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves." *Cent. Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 730 (Ind. 2008).

"[T]he geographic limit must ordinarily be no broader than the scope of the employee's former responsibilities." *Prod. Action Int'l, Inc. v. Mero*, 277 F. Supp. 2d 919, 925 (S.D. Ind. 2003). For example, in *Zimmer US, Inc. v. Miller*, the court found that the geographic scope of a non-compete was reasonable where the scope of the restriction was limited to the "geographic area" where the sales representative had "engaged in marketing activity" during the final 18 months of employment. *Id.* (internal citation omitted). Similarly, in *Zimmer, Inc. v. Sharpe*, the court upheld a geographic scope that defined the restricted territory based on the employee's area of responsibility. *Zimmer, Inc. v. Sharpe*, No. 3:09-CV-117 RM, 2009 WL 10690836, at *4 (N.D. Ind. Mar. 31, 2009). The Court found that it was reasonable for the "relevant geographic provision as stated in the agreements" to be "the territory… in which the Employee was responsible for cultivating or maintaining competitive advantages on Company's behalf, [during the last two years of Employee's employment with Company].'" *Id.*

Important here, Indiana courts enforce a geographic restriction spanning across many states where the restriction is co-extensive with the employee's former area of responsibility. For example, in *Coates v. Heat Wagon, Inc.*, the court found that a non-compete's geographic scope was reasonable where it prohibited a former sales manager from competing in the 19 states where he had contact with customers and vendors during his prior employment. 942 N.E.2d 905, 915 (Ind. Ct. App. 2011). Similarly, in *Biomet 3i, LLC v. Land*, the court found the geographic scope was reasonable when it spanned the 15 states that the former territory sales manager had overseen during her employment. No. 116CV00125TLSSLC, 2017 WL 1483461, at *9 (N.D. Ind. Jan. 10, 2017), *report and recommendation adopted,* No. 1:16-CV-125-TLS, 2017 WL 1483469 (N.D. Ind. Feb. 27, 2017). Indeed, the language in the Gregory's noncompetition provision is similar to the restriction in *Biomet 3i, LLC,* which prohibited the former employee from competing in the

"Restricted Territory," that she was assigned to or covered during her final two years of employment. *Id.* at *9.

Here, the geographic scope of the non-competition provision is the area Gregory oversaw in her final two years of employment and is reasonable under Indiana law. Gregory is restricted from obtaining a Competitive Position or performing a Restricted Activity for a Competitor in "any geographic area in which the Company does business and which Participant provided services in, had responsibility for, had a material presence or influence in, or had access to Confidential Information about, such business, within the Look Back Period." (VAC, Ex. A, § 7(b)(ii).) Here, the geographic scope governing the Competitive Position and Restricted Activity is co-extensive with the 14 states that Gregory oversaw and that are defined through the "Restricted Territory" definition in Section 7(b)(ii). Like the geographic restrictions that were upheld in *Zimmer US, Inc.* and *Zimmer, Inc.*, Gregory's restrictions are limited the geographic area where she had responsibilities.

> d. The non-competition provision is reasonable in its functional scope.

As noted above, the Agreement contains two independent functional restrictions, both of which Gregory has violated. The functional restrictions prohibit Gregory from (1) obtaining a "Competitive Position" and (2) performing a "Restricted Activity." Both of these independent restrictions are reasonable under well-settled Indiana law because they prevent Gregory only from engaging in the same or similar services as those she provided for Elevance Health.

Under Indiana law, a non-compete's functional scope is reasonable where it "restrict[s] an employee from working for a competitor in a similar role or by providing similar services to the employee's former employment." *Biomet 3i, LLC v. Land*, No. 116CV00125TLSSLC, 2017 WL 1483461, at *8 (N.D. Ind. Jan. 10, 2017), *report and recommendation adopted,* No. 1:16-CV-125-

TLS, 2017 WL 1483469 (N.D. Ind. Feb. 27, 2017). In *Biomet 3i, LLC*, the court enforced an 18-month non-compete that applied across 15 states, where the functional scope prevented the employee from working for a competitor in "any sales or sales management capacity and/or any other capacity in which Employee's knowledge of Confidential Information and/or Inventions would render Employee's assistance a competitive advantage to a Competing Organization.'" *Biomet 3i, LLC*, 2017 WL 1483461, at *8 (N.D. Ind. Jan. 10, 2017). The court found this type of restriction had previously been found reasonable in *Zimmer US, Inc. v. Keefer,* No. 3:12-CV-395-JD-CAN, 2012 WL 5268550, at *10 (N.D. Ind. Oct. 23, 2012). *See also Cork Med., LLC v. Lukaszewski*, No. 1:15-CV-00765-DKL, 2015 WL 5227929, at *10 (S.D. Ind. Sept. 4, 2015) (where the court found reasonable a functional restriction that prohibited the former employee from working "'in the same or similar capacity or function' to that in which he worked for Cork.").

Here, the two functional restrictions of the non-competition provision are narrowly tailored and only restrict Gregory from engaging in the same or similar activities as those she performed for Elevance Health. The functional restrictions are therefore reasonable, as discussed below.

### 1. The definition of "Competitive Position" is reasonable.

Gregory cannot perform services in a Competitive Position where (A) the services are "the same as or similar to the services that [she] performed for [Elevance] in the [Look Back Period]," or (B) in the performance of services Gregory "will likely use" Elevance Health's Confidential Information. (VAC, Ex. A, § 7(b)(i).) Both provisions are reasonable and enforceable under Indiana law.

 Restricting an employee from performing the "same or similar services" for a competitor as those performed during the most recent years of the employee's former employment is a common restriction that has been routinely enforced in Indiana. *See Cork Med., LLC, supra*; *Biomet 3i,* 2017 WL 1483461, at *8 ("Non-compete provisions are reasonable where they restrict

20

an employee from working for a competitor in a similar role or by providing similar services to the employee's former employment[.]").

The Competitive Position restriction also reasonably restricts Gregory from performing services for a Competitor in which she "will likely use any Confidential Information of [Elevance Health]." (VAC, Ex. A, § 7(b)(i).)  This type of restriction was upheld in *Biomet 3i, LLC*, where the non-compete prohibited the former employee from working in a capacity "in which Employee's knowledge of Confidential Information [] would render Employee's assistance a competitive advantage to a Competing Organization." 2017 WL 1483461, at *8 (N.D. Ind. Jan. 10, 2017); *Zimmer US*, 2012 WL 5268550, at *10 (enforcing covenant using substantially similar language).

2.   The definition of "Restricted Activity" is reasonable.

Gregory also cannot engage in a Restricted Activity, which is defined to prohibit Gregory from performing any activity for a Competitor within the Restricted Territory "for which [she] had responsibility for [Elevance Health] or about which [she] had Confidential Information within the Look Back Period." (VAC, Ex. A, § 7(b)(iii).)  The first part of the restriction is similar to that functional restriction found to be reasonable in *Cork Med. See* 2015 WL 5227929, at *10 (S.D. Ind. Sept. 4, 2015). Additionally, the second part of the restriction mirrors the restriction upheld in *Biomet 3i, LLC*, restricting a former employee from using confidential information to compete on behalf of a Competitor. *See* 2017 WL 1483461, at *8 (N.D. Ind. Jan. 10, 2017).

Gregory remains free to work at any employer in the nation during the Restricted Period and within the Restricted Territory, including "Competitors" of Elevance Health. But if she does work for a Competitor during that time and in that geographic area, she must not (i) perform services (i.e., underwriting) that are similar to the services she provided for Elevance Health, (ii) engage in any activity that is one in which she had responsibility at Elevance Health, or (iii) engage

in any activity that is one where she obtained Confidential Information during the Look Back Period. This is a plainly reasonable restriction. Moreover, Gregory was a sophisticated and highly compensated employee who voluntarily entered into the Agreement.[6] By the end of her employment she earned an annualized base salary of $238,840.73 and, in exchange for executing the Agreement, received additional equity compensation, all of which demonstrate the reasonableness of the restrictions.

The functional restrictions imposed by the Agreement are narrowly tailored and reasonable under governing Indiana law.

### iii.   Even if there was overbreadth, it could be cured by applying Indiana's blue pencil doctrine.

While the non-competition provision is reasonable and enforceable under well-settled Indiana law, even if the Court were to find otherwise, any overbroad provision should be cured by application of Indiana's blue pencil doctrine. Indiana law permits the Court to blue pencil the Agreement by severing unreasonable, divisible portions of the Agreement and enforcing the remaining reasonable portions.

"If a court deems a noncompetition provision unreasonable, it will apply the 'blue pencil doctrine,' severing unreasonable, divisible portions and then enforcing the reasonable parts that remain." *MED-1 Sols., LLC v. Taylor*, 247 N.E.3d 1269, 1280 (Ind. Ct. App. 2024). In Indiana, "this doctrine 'is really an eraser'—while the court may erase unreasonable, divisible terms from

---

[6]Indiana law has also recognized that an employee's level of compensation and senior role are relevant to the reasonableness of the restriction. *See, e.g., Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 94 (Ind. Ct. App. 2001) (holding broad functional restriction was reasonable because the employee "knowingly executed the employment agreement" and was "handsomely compensated" as an employee of the company); *Harlan Laboratories, Inc. v. Campbell*, 900 F.Supp.2d 99, 107 (D. Mass. 2012) (applying Indiana law and noting that the employee's "high level job role and compensation" made him a "sophisticated management employee, capable of a clear understanding of what conduct is prohibited by this agreement.").

a restrictive covenant until only reasonable portions remain, it cannot rewrite the covenant by adding, changing, or rearranging terms." *Id.* at 1280-81.

Here, the noncompetition provision is reasonable and enforceable under Indiana law. However, if the Courts finds any portion unreasonable or overbroad, it may sever such portions and enforce the remainder of the Agreement. (*See* VAC, Ex. A, § 9(c)) ("If an arbitrator or court shall hold that the direction, scope, area, or activity restrictions stated herein are unreasonable under circumstances then existing, or under applicable state law, the arbitrator or court shall reform or modify the restrictions or enforce the restrictions to such lesser extent as is allowed by law."). Courts applying Indiana law will commonly blue pencil an overbroad non-compete in the context of issuing preliminary injunctive relief. *See, e.g., AL-KO Axis, Inc. v. Revelino*, No. 3:13-CV-1002 JD, 2013 WL 12309288, at *19 (N.D. Ind. Oct. 25, 2013).

### C.  Gregory breached the Agreement.

As explained above, Gregory breached the Agreement when she resigned from Elevance Health and immediately began employment with Gravie as a Senior Vice President, Underwriting, where she is involved only in Gravie's level-funded plans, directly competing with Elevance Health's level-funded plans. (*See* Facts Subsections C-D.)  Gregory's work for Gravie represents an independent breach of both functional restrictions in the Agreement, including that (1) Gregory is providing services in a Competitive Position and (2) engaging in a Restricted Activity for a Competitor within the Restricted Territory.

### III.  <u>Elevance Health Will Be Irreparably Harmed if the Preliminary Injunction Is Not Granted.</u>

Elevance Health faces a likely risk of irreparable harm if Gregory is permitted to continue unfairly competing in violation of her obligations under the Agreement. Indeed, under Indiana law it is well-established that breach of a covenant not to compete is prima facie evidence of irreparable

harm. Moreover, the harm Elevance Health will suffer to its level-funded plan business cannot be adequately compensated in monetary damages.

### A. Breach of a non-compete agreement is prima facie evidence of irreparable harm under Indiana law.

Under Indiana law, it is well established that the breach of a non-compete is "prima facie evidence of irreparable harm justifying injunctive relief." *Vickery v. Ardagh Glass Inc.*, 85 N.E.3d 852, 864 (Ind. Ct. App. 2017); *Cent. Indiana Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 733 (Ind. 2008) ("[A] preliminary injunction is appropriate to remedy a breached noncompetition agreement.") (gathering cases). Indeed, an employer need not point to specific losses in the business to establish irreparable harm. *Hannum Wagle & Cline Eng'g, Inc. v. Am. Consulting, Inc.*, 64 N.E.3d 863, 876 (Ind. Ct. App. 2016); *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind. Ct. App. 1997). Moreover, under Indiana law, courts consider persuasive the parties' stipulation in a written agreement that irreparable harm will result from breaching a non-compete. *See Kuntz v. EVI, LLC*, 999 N.E.2d 425, 430 (Ind. Ct. App. 2013) (noting that a contractual stipulation was "persuasive in determining that a preliminary injunction is appropriate."); *see also Kira (US) Inc. v. Samman*, No. 123CV919MSNWEF, 2023 WL 4687189 (E.D. Va. July 21, 2023) (applying Delaware law and finding that the plaintiff faced a likelihood of irreparable harm per the parties' contractual stipulation).

For example, in *Vickery*, the court found that a TRO was appropriate because, without one, the employer risked likely irreparable harm. 85 N.E.3d at 865. There, the former employee was a Senior Mould Engineer who left to work for a competitor. *Id.* at 855. The employee notified his former employer of his departure and the identity of his new employer. *Id.* On his last day of employment, the former employer filed suit to enforce the covenant not to compete. *Id.* at 856. The court granted a TRO and later granted a preliminary injunction. *Id.* In assessing whether the

employer had showed irreparable harm, the court noted that "breach of a covenant not to compete is prima facie evidence of irreparable harm justifying injunctive relief." *Id.* at 864.

Elevance Health will suffer irreparable harm if preliminary injunctive relief is not granted. Indeed, Gregory correctly stipulated that her breach would result in irreparable harm to Elevance Health.[7] Gregory had access to significant and critical confidential information in her role as Regional Vice President II, Underwriting, within Elevance Health's "Underwriting Center of Excellence" and overseeing Elevance Health's Anthem Balanced Funding plans. This information can and likely will be used by Gregory in her role at Gravie to compete with Elevance Health, outbid Elevance Health, and weaken Elevance Health's position in the level funded insurance market.

Moreover, to the extent that Elevance Health would be able to prove quantifiable damages (which will be extremely difficult, as discussed below), the lost profits could be in the millions of dollars, which would far exceed the amount that Gregory, as an individual, could pay. *See Simpson Plastering, LLC v. Skanska/Trident*, No. CV 2:16-3439-RMG, 2017 WL 773550, at *2 (D.S.C. Feb. 27, 2017) (holding that "federal courts have found preliminary injunctions appropriate where it has been shown that the defendant [] or is judgment-proof[.]"); *Levine v. Meador*, No. 120CV1073TSETCB, 2022 WL 18912678, at *12 (E.D. Va. Mar. 29, 2022), *report and recommendation adopted,* No. 1:20-CV-1073, 2022 WL 18912217 (E.D. Va. Aug. 18, 2022) (holding that "[d]amages are insufficient because Meador is a judgment-proof[.]"). Here, Gregory

---

[7] *See* (VAC, Ex. A, § 9(b).) ("[Gregory] agrees that if [she] commits or threatens to commit a breach of any of the covenants and agreements contained in Section 7, then… any such breach would cause irreparable injury to the Company and that money damages would not provide an adequate remedy.").

319472715v3

will not be able to satisfy a large judgment against her, which will leave Elevance with no adequate remedy at law.

###   B.   Damages resulting from Gregory's breach will be difficult to quantify, meaning that Elevance Health has no adequate remedy at law.

Irreparable harm is also satisfied here because it will be extremely difficult to quantify the damages resulting from Gregory's breach of the non-compete agreement.

Under Indiana law, irreparable harm exists where damages resulting from a breach of a noncompete agreement will be difficult to ascertain and cannot adequately be compensated in monetary damages. *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 178 (Ind. Ct. App. 2008); *see also Zimmer, Inc. v. Sharpe,* No. 3:09-CV-117 RM, 2009 WL 10690836, at *4 (N.D. Ind. Mar. 31, 2009); *see also Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 785 (4th Cir. 2011) (recognizing that loss of goodwill, loss of customers, and loss of the ability to attract new customers are difficult to quantify in terms of money damages and thus may justify injunctive relief). Injunctive relief is appropriate where a "legal remedy will be inadequate because it provides incomplete relief or relief that is inefficient 'to the ends of justice and its prompt administration.'" *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 912 (Ind. Ct. App. 2011) (citing *Robert's Hair Designers, Inc. v. Pearson*, 780 N.E.2d 858, 864 (Ind. Ct. App. 2002)); *see also Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 517 (E.D. Va. 2021) ("Generally, irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate."); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 666 (7th Cir. 2015) (finding that "[t]he injuries that flow from the violation of a non-compete are difficult to prove and quantify" and therefore, are "a canonical form of irreparable harm.").

For example, in *Coates v. Heat Wagons, Inc.*, the court found the employer faced a likelihood of irreparable harm over the prospect of a former sales manager continuing his

involvement in the sale of heater parts after his termination. *Coates*, 942 N.E.2d at 912 (Ind. Ct. App. 2011). There, the former sales manager started a competing business while employed, was terminated upon its discovery, and was sued by his former employer to enforce noncompetition provisions. *Id.* at 910-11. The trial court concluded that there was "no apparent way to measure the loss of sales to PHP[.]." *Id.* at 912. Indeed, Coates's competition posed a threat of irreparable harm because of his knowledge of the market, his knowledge of vendors, and his recognition by both vendors and customers. *Id.* Moreover, his competition posed a "significant potential of future harm" because of the competitive nature of the market. *Id.* "Coates's competition with PHP holds a potentially unique risk of harm because of how well informed Coates was on DESA products as a result of his work for PHP." *Id.*

Here, the harm Elevance Health faces will be very difficult to quantify, or ascertain and thus monetary damages are an inadequate form of relief. Gregory held a key executive position at Elevance Health and received access to Confidential Information, including regarding Elevance Health's level-funded plan business. Gregory will likely use the confidential and valuable information of Elevance Health to gain a competitive advantage for Gravie and weaken Elevance Health in the market. The number of customers that Elevance Health will lose will be incalculable, and most of Gregory's conduct will take place behind the doors of Gravie, so Elevance will be kept in the dark. The harm to Elevance Health will be particularly acute in cases where it is not an incumbent but merely bidding on the same work as Gravie. Like in *Coates*, Gregory poses a "potentially unique risk of harm" because of her deep understanding of the level-funded plan market and her access to Elevance Health's confidential business and pricing strategies. This unique risk cannot be quantified and will not be completely remedied by monetary damages, rendering injunctive relief the only relief capable of preventing irreparable harm.

319472715v3

**IV.    An Injunction is in the Public's Interest and the Balance of Equities Tips in Elevance Health's Favor.**

The balance of equities favors Elevance Health because injunctive relief would only prohibit Gregory from violating her contractual obligations to Elevance Health, which she voluntarily undertook. Moreover, public interest favors protecting confidential business information and enforcing valid contracts.

Under similar facts the court in *Kira (US) Inc. v. Samman* granted a temporary restraining order in plaintiff's claim to enforce a restrictive covenant and found that the balance of equities favored the employer. *Kira (US) Inc. v. Samman*, No. 123CV919MSNWEF, 2023 WL 4687189, at *5 (E.D. Va. July 21, 2023). There, like here, the company was "at risk of suffering irreparable harm, including a loss of clients, absent injunctive relief." *Id.* While injunctive relief would prohibit the former employee from working for his new employer, the employee voluntarily entered the noncompete agreement, which he breached. *Id.* Moreover, the injunctive relief did not preclude the former employee from working elsewhere but only restricted him from violating his contractual obligations under the agreement. *Id.*

*Kira* is instructive. Here, like in *Kira*, Gregory willingly entered into the Agreement. The Agreement was not a condition of employment. Gregory's position with Gravie directly competes with Elevance Health's level-funded plan business and Elevance Health faces the immediate risk of irreparable harm if injunctive relief is not granted. Further, injunctive relief will not preclude Gregory from working, it will only prohibit Gregory from working in a competitive position within the Restricted Territory for a twelve-month period.

Finally, public interest favors injunctive relief. "Public interest favors protecting confidential business information and enforcing valid contracts." *Kira (US) Inc.*, 2023 WL 4687189, at *5 (E.D. Va. July 21, 2023). "The public has an interest in allowing companies like

28

[plaintiff] to protect confidential information, to obtain temporary injunctive relief to enjoin any further breach or disclosure, and ultimately to avoid irreparable harm and the destruction of incentives to develop proprietary information." *Id.* (quoting *Cap. One Fin. Corp. v. Sykes*, No. 20-cv-763, 2021 WL 2903241, at *15 (E.D. Va. July 9, 2021)). Here, public interest favors protecting Elevance Health's confidential information and enforcing its valid contracts.

## V. <u>The Parties Waived The Bond Requirement Through the Agreement.</u>

Ordinarily, before issuing a TRO or preliminary injunction, Fed.R.Civ.P. 65(c) would require Elevance Health to give security in an amount that the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. However, courts in this district have consistently recognized that parties may waive this requirement through contract. *See Ervin Graves Strategy Grp., LLC v. Feikes,* No. 1:23-CV-1395 (PTG/LRV), 2023 WL 11690929, at *2 (E.D. Va. Dec. 20, 2023) (finding the parties waived bond requirement through the at-will employment contracts in connection with plaintiff's claim to enforce restrictive covenants); *see also Vocelli, LLC v. JAF3, Inc.,* No. 1:23-CV-1284 (PTG/LRV), 2023 WL 9105453, at *1 (E.D. Va. Dec. 20, 2023); *JTH Tax, Inc. v. Aime,* No. 2:16CV279, 2016 WL 8674623, at *4 (E.D. Va. July 1, 2016), report and recommendation adopted, No. 2:16CV279, 2016 WL 4182743 (E.D. Va. Aug. 3, 2016).

Here, the parties waived the bond requirement pursuant to Section 9(b) of the Agreement. (VAC, Ex. A, § 9(b)) ("[T]he Company shall have the right to seek and obtain all appropriate injunctive relief [], without posting bond therefore, except as required by law[.]").

## <u>CONCLUSION</u>

For the reasons above, Elevance Health respectfully requests that the Court enter a temporary restraining order or, alternatively, a preliminary injunction requiring Ms. Gregory to honor her contractual promises, on the terms set forth in Elevance Health's accompanying motion.

ELEVANCE HEALTH, INC.


By /s/ Andrew J. Henson
       Andrew J. Henson, VSB No. 95622
       Patrick D. Houston, VSB No. 92298
       Troutman Pepper Locke
       1001 Haxall Point
       Richmond, VA 23219
       Telephone: (804) 697-1200
       Facsimile: (804) 697-1339
       andrew.henson@troutman.com

       *Counsel for Plaintiff*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 26th day of September, 2025, a true and accurate copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following CM/ECF participants:

William Sutton Ansley, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison LLP
2001 K St., NW
Washington, DC 20006
Email:  sansley@paulweiss.com

Liza Velazquez, Esquire
Pietro J. Signoracci, Esquire
Tenisha Williams
Paul Weiss Rifkind Wharton & Garrison LLP
1285 6th Avenue
New York, NY 10019
Email: lvelazquez@paulweiss.com
psignoracci@paulweiss.com
twilliams@paulweiss.com

/s/ Andrew J. Henson

319472715v3